**2017 BNH 018**        **Note:  This is an unreported opinion. Refer to LBR 1050-1 regarding citation.**
_____

# UNITED STATES BANKRUPTCY COURT
# DISTRICT OF NEW HAMPSHIRE

In re:                                                      Bk. No. 16-10988-BAH
                                                            Chapter 7

Cynthia J. Hudson,
            Debtor

State of New Hampshire Department
of Employment Security,
            Plaintiff

v.                                                          Adv. No. 16-1247-BAH

Cynthia J. Hudson
            Defendant

*Walter L. Maroney, Esq.*          *Arthur O. Gormley, III, Esq.*
*State of New Hampshire Department of*    *Gormley & Gormley, PC*
*Employment Security*              *Nashua, NH*
*Concord, NH*                      *Attorney for the Defendant*
*Attorney for the Plaintiff*

## MEMORANDUM OPINION

## I. INTRODUCTION

The matter before the Court is the Complaint filed by the plaintiff State of New Hampshire

Department of Employment Security (the "Department") against the defendant Cynthia J. Hudson

(the "Debtor") seeking a determination that her debt for the overpayment of unemployment

compensation benefits is excepted from discharge pursuant to 11 U.S.C. § 523(a)(2)(A) in light of

the Debtor's alleged fraud in seeking these payments.[1]  The Court conducted a trial on May 9, 2017, at which two witnesses—the Debtor and Michelle Sousa ("Sousa"), a Department fraud investigator—testified and eleven exhibits were admitted into evidence.  For the reasons set forth below, the Court will enter judgment in favor of the Department.

## II. JURISDICTION

This Court has authority to exercise jurisdiction over the subject matter and the parties pursuant to 28 U.S.C. §§ 157(a), 1334, and U.S. District Court for the District of New Hampshire Local Rule 77.4(a).  This is a core proceeding under 28 U.S.C. § 157(b)(2)(I).

## III. FACTS

A. Background

The present case concerns unemployment compensation benefits that the Debtor sought and received from the Department in 2004, and again in 2010.  During these time periods, requests for financial assistance were made to the Department online using certified claim forms.[2]  As will be described in greater detail below, the claim forms used in 2010 were subsequently modified from those in use in 2004.  Nevertheless, both claim forms generally ask a number of questions requiring a "yes" or "no" answer, including "Did you work or perform any services, including self-employment, during the week you are claiming?" "Did you refuse any work . . . ?" "Did you

---

[1] The Department filed a two count complaint alleging that the debt was nondischargeable pursuant to 11 U.S.C. § 523(a)(2)(A) and/or (B).  At trial, the Department did not present evidence with respect to its claim under 11 U.S.C. § 523(a)(2)(B) and subsequently waived it in its post-trial submission.  See Doc. No. 19 at 2 n.2.

[2] See Ex. 8.  Exhibit 8 consists of the screen shots of the Debtor's weekly claim certifications that she submitted online to the Department.  Unlike those from 2010, a certification does not appear on the screen shots of the 2004 claims.  Notably, the Debtor did not argue that those claims were not certified.  In any event, the absence of a certification from those claims would not alter the result in this case.

receive any monies not previously reported to this department, other than wages for hours actually worked?" and "Were you able to work and available for work during the week you are claiming?".[3] If the claimant worked during the week, the claim forms prompt entry of the amount of gross earnings for the week.[4]  The Department then calculates and pays an unemployment benefit to the claimant based on the answers supplied.  At trial, Sousa testified that the Department relies on the truthfulness of the statements contained within the weekly claim certifications because it does not have the capacity or resources to investigate every claim.

Under New Hampshire law, "[a]ny individual who willfully makes a false statement or representation or knowingly fails to disclose a material fact . . . to obtain or increase any benefit or other payment under this chapter . . . may, in the discretion of the commissioner or his or her authorized representative, be determined to be disqualified for benefits for each week directly affected by the false statement or representation or failure to disclose a material fact."  N.H. R.S.A. § 282-A:164.  Moreover, if an "individual left work voluntarily without good cause," the "individual shall be disqualified for benefits . . . [u]ntil [subsequent to certain dates] the individual has earned in each of 5 weeks wages in employment . . . of at least 20 percent more than such individual's weekly benefit amount."  N.H. R.S.A. § 282-A:32(I); See N.H. Admin. R. Emp. 503.01 (an individual is considered to have left work voluntarily without good cause where it was the individual's own choice to terminate the employment for a reason not attributable to the employer).  All benefits received while disqualified are deemed overpaid, and the recipient will be ordered to make "restitution in an amount equal to such overpayment plus a penalty equal to 20 percent of the overpaid benefits."  N.H. R.S.A. § 282-A:164.  Additionally, an individual subject

---

[3] See, e.g., Ex. 8 at 1.

[4] Id.

3

to disqualification will also be deemed ineligible to receive benefits "for not less than 4 nor more than 52 consecutive weeks, beginning with the week in which the decision is made." Id.

B. The 2004 Overpayment

From July 3, 2004, through July 24, 2004, the Debtor submitted four consecutive weekly claims to the Department.  Each time, she certified that she did not work during the week or have gross earnings.[5]  As a result of these claims, the Department paid the Debtor $64.00 each week for a total $256.00.[6]  A company known as Winco Identification of Nashua, New Hampshire, however, supplied the Department with documentation showing that the Debtor worked there 20 hours per week and was paid gross earnings of $260.00 per week for each week she submitted a claim.[7]  Sousa testified that the case file notes by the fraud investigator in 2004 reflect that the Debtor admitted that she knowingly misrepresented her earnings because she needed the money.

On September 23, 2004, the Department issued a decision finding that the Debtor knowingly failed to report her work and earnings in violation of N.H. RSA § 282-A:164, and as such, was disqualified from receiving benefits during the weeks claimed (the "2004 Decision").[8]  The 2004 Decision also required her to repay the overpaid benefits in the amount of $256.00.[9]  Attached to the 2004 Decision was a document titled "Your Appeal Rights," informing the Debtor of her right to file an appeal of the decision within fourteen calendar days following the date of mailing.[10]  The 2004 Decision was mailed to the Debtor in the ordinary course, but no appeal was

---

[5] Ex. 8 at 1-3.

[6] Ex. 1 at 4.

[7] Id.

[8] Id. at 1-2.

[9] Id. at 2.

[10] Id. at 3.

filed by the deadline.  At trial, the Debtor testified that she had no recollection of the 2004 Decision.

     C. <u>The 2010 Overpayment</u>

     Between January 30, 2010 and October 2, 2010, the Debtor submitted thirty-seven consecutive weekly claims to the Department.  As previously mentioned, the claim form used in 2010 varies from the one in use in 2004, but calls for substantially similar information.  The most notable difference is that many of the questions in the 2010 form are now followed by parenthetical comments that appear intended to provide clarification or instruction.  The form that the Debtor repeatedly completed is as follows:[11]

|  |  | <u>My<br>Answer</u> |
|---|---|---|
| 1. | During the week claimed, were you *available* for work? *(Being available for work means that you start new work or, if on temporary layoff, could return to work for your employer if/when asked.)* | [Yes/No] |
| 2. | During the week claimed, were you physically and mentally *able* to work? | [Yes/No] |
| 3. | During the week claimed, | |
| | a. did you refuse work or a referral to work? | [Yes/No] |
| | b. did you quit employment? | [Yes/No] |
| | c. were you discharged (fired) from employment? | [Yes/No] |
| 4. | Did you receive, or will you receive, holiday pay for a holiday that occurred during the week claimed? | [Yes/No] |
| | a. If YES, please provide the total gross amount of the holiday pay.  *(If you do not know your gross amount of holiday pay, leave blank, but your claim will not be paid until this department receives this information.  Press HELP for how to report at a later time.)* | [$0.00] |
| 5. | Did you work or perform any services, including self-employment, during the week claimed, regardless of whether or not you have yet been paid for the work or services? | [Yes/No] |

---

[11] <u>See, e.g.,</u> Ex. 8 at 4.

| | |
|---|---|
| a. If YES, provide the number of hours worked. | [#] |
| b. Provide your gross earnings (before taxes and deductions) for the week claimed. *(If you do not know your gross earnings, leave blank, but your claim will not be paid until this department receives this information.  Press HELP for how to report at a later time.)* | [$0.00] |
| c. Does the earnings amount you provided include the earnings from all employers you worked for during the week claimed? *(If you have not provided all earnings from all employers you worked for this week, your claim will not be paid until this department receives all information.  Press HELP for how to report at a later time.)* | [Yes/No] |

| | | |
|---|---|---|
| 6. | During the week claimed, did you receive any monies not previously reported to this department, other than wages for hours actually worked? | [Yes/No] |

Each weekly claim form also contained the following certification (the "Certification") that the Debtor was required to check off prior to submitting the application:

> CERTIFICATION: I understand the answers I give to the above questions may affect my rights to benefit payments.  I certify that these are true and correct and I am not claiming any benefits from any other unemployment program for the above week.  I understand the la [sic] penalties for false statements.[12]

Although the certification appears incomplete in the record, the Department states, and the Debtor does not contest, that the language cutoff from the printed document reads "I understand the *law provides* penalties for false statements."[13]

As was the case in 2004, the Department subsequently discovered the Debtor's weekly claim certifications were inconsistent with the information supplied by her employers.  As part of her fraud investigation, Sousa reviewed payment records from three companies: Innseason Management, Inc. ("Innseason"), Serif, Inc. ("Serif"), and VP Resales LLC ("VP Resales").  The documentation reflected that the Debtor was employed at various hourly rates with bonuses and commissions at both Innseason and Serif, and on a straight commission basis with VP Resales.[14]

---

[12] Id.

[13] Plaintiff/Creditor's Post Trial Memorandum, Doc. No. 19 at 18 (emphasis added).

[14] Ex. 6 at 3; Ex. 9.

Sousa further discovered that the Debtor voluntarily quit employment at Innseason on April 7, 2010, Serif on April 14, 2010, and, after briefly returning, Innseason again on May 22, 2010.[15] None of these voluntary terminations were reported in response to question 3(b) on the claim certifications for those weeks.

The following table is a condensed reproduction of the "Summary of Alleged Fraudulent Weeks"[16] presented at trial by the Department in which Sousa summarized the Debtor's weekly claim certifications and compared them to the employers' reports:

| Claim Week Ending | Work Hours Reported | Earnings Reported | Employer | Hours Actually Worked | Gross Earnings Paid | Date Wages Paid | Amount of Benefit Paid |
|---|---|---|---|---|---|---|---|
| 1/30/2010 | None | None | Innseason | 23.23 | $256.68 | 2/6/2010 | $427.00 $25.00 |
| 2/06/2010 | 24 | $130.00 | Innseason | 18.10 | $237.20 | 2/13/2010 | $425.00 $25.00 |
| 2/13/2010 | 21 | $150.00 | Innseason | 21.23 | $279.76 | 2/20/2010 | $405.00 $25.00 |
| 2/20/2010 | 21 | $180.00 | Innseason | 16.52 | $328.24 | 2/27/2010 | $375.00 $25.00 |
| 2/27/2010 | 24 | $200.00 | Innseason | 23.13 | $352.56 | 3/6/2010 | $355.00 $25.00 |
| 3/6/2010 | 16 | $130.00 | Innseason | 16.52 | $208.24 | 3/13/2010 | $425.00 $25.00 |
| 3/13/2010 | 16 | $150.00 | Innseason | 13.18 | $168.16 | 3/20/2010 | $405.00 $25.00 |
| 3/20/2010 | 16 | $120.00 | Innseason | 4.40 | $54.80 | 3/27/2010 | $427.00 $25.00 |
| 3/27/2010 | 16 | $159.00 | Innseason | 16.27 | $217.96 | 4/3/2010 | $396.00 $25.00 |
| 4/3/2010 | 16 | $130.00 | Innseason | 22.5 | $188.13 | 4/10/2010 | $425.00 $25.00 |
| 4/10/2010 | 16 | $150.00 | Innseason* | 12.18 | $88.31 | 4/17/2010 | $405.00 $25.00 |
| 4/17/2010 | 16 | $130.00 | Serif, Inc.* | 24 | $240.00 | 4/28/2010 | $425.00 |

[15] Ex. 6 at 3.

[16] Ex. 6.  For the sake of clarity, the Court reordered the columns and omitted information that is unnecessary to the outcome of this case.  The separate $25.00 payments in the "Amount of Benefit Paid" column represent "Federal Additional Compensation."

| | | | Innseason | 0 | $140.00 | 4/24/2010 | $25.00 |
|---|---|---|---|---|---|---|---|
| 4/24/2010 | 16 | $130.00 | Innseason | 8.15 | $59.09 | 5/1/2010 | $425.00 $25.00 |
| 5/1/2010 | 16 | $130.00 | Innseason | 18.84 | $161.59 | 5/8/2010 | $425.00 $25.00 |
| 5/8/2010 | 16 | $130.00 | Innseason | 19.46 | $191.09 | 5/15/2010 | $425.00 $25.00 |
| 5/15/2010 | 16 | $130.00 | Innseason | 16.40 | $208.90 | 5/22/2010 | $425.00 $25.00 |
| 5/22/2010 | 16 | $130.00 | Innseason* | 17.58 | $152.46 | 5/29/2010 | $425.00 $25.00 |
| 5/29/2010 | 10 | $99.00 | --- | --- | --- | --- | $427.00 $25.00 |
| 6/5/2010 | 16 | $130.00 | --- | --- | --- | --- | $425.00 $25.00 |
| 6/12/2010 | 14 | $130.00 | --- | --- | --- | --- | $425.00 $25.00 |
| 6/19/2010 | 16 | $130.00 | --- | --- | --- | --- | $425.00 $25.00 |
| 6/26/2010 | 16 | $130.00 | --- | --- | --- | --- | $425.00 $25.00 |
| 7/3/2010 | 16 | $130.00 | --- | --- | --- | --- | $425.00 $25.00 |
| 7/10/2010 | 14 | $129.00 | --- | --- | --- | --- | $426.00 $25.00 |
| 7/17/2010 | 13 | $118.00 | --- | --- | --- | --- | $250.00 $25.00 |
| 7/24/2010 | 13 | $99.00 | VP Resales LLC | --- | $0.00 | --- | $427.00 $25.00 |
| 7/31/2010 | 12 | $105.0 | VP Resales LLC | --- | $90.00 | 8/13/2010 | $427.00 $25.00 |
| 8/7/2010 | 12 | $120.03 | VP Resales LLC | --- | $540.00 | 8/13/2010 | $427.00 $25.00 |
| 8/14/2010 | 12 | $130.00 | VP Resales LLC | --- | $0.00 | --- | $425.00 $25.00 |
| 8/21/2010 | 16 | $130.00 | VP Resales LLC | --- | $508.50 | 8/27/2010 | $425.00 $25.00 |
| 8/28/2010 | 15 | $150.00 | VP Resales LLC | --- | $904.20 | 9/10/2010 | $405.00 $25.00 |
| 9/4/2010 | 15 | $150.00 | VP Resales LLC | --- | $353.40 | 9/10/2010 | $405.00 $25.00 |
| 9/11/2010 | 15 | $150.00 | VP Resales LLC | --- | $120.00 | 9/24/2010 | $405.00 $25.00 |
| 9/18/2010 | 15 | $150.00 | VP Resales LLC | --- | $90.00 | 9/24/2010 | $405.00 $25.00 |

8

| 9/25/2010 | 15 | $150.00 | VP Resales LLC | --- | $217.20 | 10/8/2010 | $405.00 $25.00 |
| 10/2/2010 | 15 | $160.00 | VP Resales LLC | --- | $0.00 | 10/8/2010 | $395.00 $25.00 |
| *Voluntary Quit | | | | | | | |

As is apparent from the above table, the Debtor's actual wages are consistently inconsistent with her weekly claim certifications.  The Court notes, however, that in each case the wages were paid after the weekly claim certification was submitted.

On October 6, 2010, Sousa conducted a telephonic interview of the Debtor, the substance of which was contemporaneously recorded in the narrative summary of her investigation.[17]  Sousa testified that the Debtor informed her that the income reported on her weekly claim certifications was from self-employment under the name of Mystique Model Management ("Mystique").  Accordingly, Sousa determined that the Debtor knowingly failed to inform the Department of her work and earnings from Innseason, Serif, and VP Resales or the three voluntary quits.  For these reasons, on October 12, 2010, the Department issued four determinations (the "2010 Determinations") that the Debtor had been overpaid unemployment benefits due to her willful misrepresentations and required her to repay the benefits in the amount of $15,699.00.[18]  As was the case with 2004 Decision, the 2010 Determinations were mailed in the ordinary course and advised the Debtor of her right to appeal.  No appeal was ever filed.

For her part, the Debtor does not dispute that her weekly claim certifications are, at least in hindsight, inaccurate.  Nevertheless, she disputes that she informed Sousa that her reported gross earnings came from Mystique, which she says never made any money, and maintains that she was properly reporting gross earnings from Innseason, Serif, and VP Resales.  To the extent that she

---

[17] Id. at 3.

[18] Exs. 2-5.

failed to appeal the 2010 Determinations that found otherwise, the Debtor testified that she never received these documents and was unaware of her right to appeal.[19]

By way of explanation, the Debtor testified that the inconsistencies in question arose as a result of her attempts to estimate her wages, which were subject to bonuses and paid on a biweekly basis, on a weekly claim certification.  The Debtor insisted that she was instructed by the Department to provide an estimate in response to question 5 due to her uncertainty, and to stay consistent each week.  Notably, Sousa testified that a biweekly employee could either estimate their hours or leave the hour and gross earnings questions blank, but noted the Department would not pay a benefit until it received from the claimant the requisite information.  The Debtor explained that each week she provided an estimate, which was sometimes more or less than her actual wages, with the expectation that everything would balance out.  She further testified that, despite clicking on it repeatedly, she probably never read the Certification.  Similarly, the Debtor testified that she never read question 6 before answering "no," indicating that she did not "[d]uring the week claimed . . . receive any monies not previously reported to this department, other than wages for hours actually worked."

At trial, the Debtor testified that she was unaware that there was a question in her weekly claim certifications asking whether she quit any employment.  Nevertheless, she testified that she believed she informed the Department that she voluntarily left employment at Innseason, insisting that she spoke to someone at the Department on the phone almost every other week.  Her testimony did not address quitting Serif or Innseason a second time.

---

[19] The Court notes that the Debtor did not state when she first learned of the 2004 Decision or 2010 Determinations.

D. Procedural History

The Debtor filed a voluntary chapter 7 case on July 5, 2016. The Department timely commenced the present adversary proceeding on September 30, 2016. The Court conducted a trial on the merits on May 9, 2017, at the conclusion of which, it took the matter under advisement. Given the complexity of the allegations, the Court ordered the parties to filed post-trial memoranda, which the Department and the Debtor did on May 30, 2017, and June 20, 2017, respectively. The matter is now ripe for determination.

## IV. POSITIONS OF THE PARTIES

A. The Department

The Department's position is straightforward. The Department asserts that the Debtor repeatedly and consistently reported less gross earnings on her weekly claim certifications than she actually earned, and failed to report voluntarily terminating her employment on three occasions. It contends that these misrepresentations were knowing, and made with the intent to induce the Department to pay her unemployment benefits to which she was not entitled. The Department's reliance on the Debtor's weekly claim certifications was justified because the system functions, at least initially, by honest and accurate self-reporting.

The Department denies that the Debtor was instructed to estimate her gross earnings, arguing that her testimony on this point is wholly incredible. The Department asserts that her contention relies on an unidentified Department representative providing instructions contrary to the claim certification form and in a manner that would never result in her earnings being reported accurately. Moreover, the Department further contends that had the Debtor been estimating her

gross earnings, she would have been required to report the undisclosed amount from the prior week in response to question 6 the following week.

B. The Debtor

The Debtor argues that the Department has failed to prove: (1) that the Debtor made any false representations to the Department knowingly or in reckless disregard for the truth; and (2) that the Debtor intended to deceive the Department. With respect to the alleged 2004 overpayment, she contends that the only evidence of her failing to report wages was the 2004 Decision, which is conclusory and does not establish her intent. In fact, the Debtor maintains that she has no recollection of what she did or did not do to obtain unemployment benefits during this period.

With respect to the 2010 overpayment, the Debtor posits that the evidence shows nothing more than a careless or sloppy approach to completing her weekly claim certifications. She argues that it is obvious that her reported hours and earnings are estimates for her outside work and not self-employment. Indeed, the Debtor contends that question 5(b) creates an incentive to estimate because it states that the claim will not be paid until the information is reported. As such, she maintains that any errors in her weekly claim certifications are simply the result of uncertainty as to how to report her biweekly earnings and bonuses on a weekly form. To the extent that her estimates were not reconciled by her subsequent answers to question 6, the Debtor asserts that question 5 is confusing, and that the Department has not demonstrated that she knowingly answered it falsely. She further maintains that other misstatements on the weekly claim certifications, such as her failure to report quitting on three separate occasions, were simple mistakes arising from not having read the questions and were otherwise disclosed to the Department during regular telephone discussions.

## V. DISCUSSION

Section 523(a)(2)(A) of the Bankruptcy Code excepts from discharge any debt "for money, property, services or an extension, renewal, or refinancing of credit, to the extent obtained by—false pretenses, a false representation, or actual fraud. . . ."  11 U.S.C. § 523(a)(2)(A).  To establish that a debt is nondischargeable under this subsection, a creditor must show that:

> 1) the debtor made a knowingly false representation or one made in reckless disregard of the truth, 2) the debtor intended to deceive, 3) the debtor intended to induce the creditor to rely upon the false statement, 4) the creditor actually relied upon the misrepresentation, 5) the creditor's reliance was justifiable, and 6) the reliance upon the false statement caused damage.

McCrory v. Spigel (In re Spigel), 260 F.3d 27, 32 (1st Cir. 2001) (citing Palmacci v. Umpierrez, 121 F.3d 781, 786 (1st Cir. 1997)) (footnote omitted); see Levasseur v. Old Republic Nat'l Title Ins. Co. (In re Levasseur), 737 F.3d 814, 818 (1st Cir. 2013); Sharfarz v. Goguen (In re Goguen), 691 F.3d 62, 66 (1st Cir. 2012).  The party contesting dischargeability must prove each element by a preponderance of the evidence.  Grogan v. Garner, 498 U.S. 279, 291 (1991).

"The first two elements of the test describe the conduct and scienter required to show fraudulent conduct, while the last four elements embody the requirement the creditor's claim must arise directly from the debtor's fraud."  Sega Auto Sales, Inc. v. Flores (In re Flores), 535 B.R. 468, 481-82 (Bankr. D. Mass. 2015) (citing In re Spigel, 260 F.3d at 32).  Indeed, the second element refers to "the debtor's intent to deceive, manipulate, or defraud . . . which is more than mere negligence."  Palmacci, 121 F.3d at 787-88.  Scienter may be established by showing that the speaker either "(a) knows or believes that the matter is not as he represents it to be; (b) does not have the confidence in the accuracy of his representation that he states or implies; or (c) knows that he does not have the basis for his representation that he states or implies."  Id. at 787 (quoting

Restatement (Second) of Torts § 526). "An honest belief, however unreasonable, that the representation is true and that the speaker has information to justify it is an insufficient basis for deceit." Id. at 788. Nevertheless, the unreasonableness of the speaker's belief may be strong evidence that it does not in fact exist. Id. Fraud may be inferred as a matter of fact from the totality of the circumstances. Id. at 789. Thus, in many cases, the same facts will establish both the debtor's knowledge or recklessness as to the falsity of his representation and his intent to deceive. Bellas Pavers, LLC v. Stewart (In re Stewart), MB 12-017, 2012 WL 5189048 at *8 n.4 (B.A.P. 1st Cir. Oct. 18, 2012) (citing Boyuka v. White (In re White), 128 Fed. Appx. 994, 998 (4th Cir. 2005)).

Here, many of the elements of the Department's claim are not in dispute. The Debtor made representations to the Department in the form of her weekly claim certifications regarding the number of hours she worked, her gross earnings, and that she had not voluntarily terminated her employment. Without question, her clear intent in submitting these weekly claim certifications was to induce the Department to pay her an unemployment benefit. The Department, in turn, actually and justifiably relied on the Debtor's weekly claim certifications in determining and paying her unemployment benefits. Thus, the remaining questions are whether the Debtor's statements were knowingly false or at least in reckless disregard for the truth, made with the intent to deceive, and the degree to which the Department was injured.

There is no dispute that that many of the Debtor's representations were inaccurate. First, in each of her 2004 weekly claim certifications, the Debtor indicated that she had not worked for the week claimed even though she had worked twenty hours each week for Winco Identification. Similarly, in her weekly claim certification dated January 30, 2010, she answered "no" to question 5(a) which asked if she performed any services during the week when she had worked

approximately twenty-three hours at Innseason that week.  On her weekly claim certifications dated April 10, 2010, April 17, 2010, and May 22, 2010, the Debtor answered "no" in response to question 3(b), indicating that she had not quit employment during the week claimed, when she had in fact voluntarily left Innseason, Serif, and Innseason again in those weeks, respectively. Curiously, in her nine weekly claim certifications submitted between May 29, 2010, and July 24, 2010, the Debtor reported that she had worked between ten and sixteen hours each week, with gross earnings between $99.00 and $130.00 per week, when it appears she did not work at all.  The Court finds that each and every one of these misrepresentations was knowingly false, or in reckless disregard for the truth, because the Debtor knew what actually occurred—whether she worked or quit—and either knew or should have known that the answer she supplied the Department in her weekly claim certification was incorrect.

It is also apparent that the hours worked and gross earnings reported in every weekly claim certification were inaccurate.[20]   The Debtor concedes as much, but asserts that these inconsistencies were a result of her good faith attempt to estimate her biweekly wages, bonuses, and commissions on a weekly basis.  She argues that the Department not only instructed her to estimate her time and gross earnings, but to do so consistently else she would jeopardize her future benefits.  While the Court finds it plausible that the Debtor was instructed to estimate her hours to the extent that she was unsure (because Sousa testified to that procedure), the Court finds her testimony regarding being instructed to estimate her gross earnings incredible.

On its face, question 5(b) requires claimants to provide their weekly gross earnings, which is not information a biweekly employee, particularly one who may earn bonuses or commissions,

---

[20] Because it does not alter the result, the Court assumes, without finding, that the Debtor reported her hours and gross earnings from her known employers, as opposed to self-employment, on her weekly claim certifications.

is likely to be able to supply readily.  Nevertheless, the form provides the answer—leave that question blank and report the gross earnings later.  Admittedly, the claim will not be paid until the Department receives the omitted information, which is consistent with the fact that the Department relies on these answers when calculating the appropriate benefit.[21]  The Debtor's assertion that the Department would provide instructions contrary to their established procedure is simply not credible.  Even more incredible, however, is the idea that the Department would instruct her to estimate "consistently," regardless of the amount of her actual paid earnings.  Accordingly, the Court finds that the Debtor's reported gross earnings on each weekly claim certification was a false statement.[22]

The Court also finds that the Debtor's consistent misrepresentations regarding her gross earnings were made knowingly or with reckless indifference for the truth.  From the outset, the fact that the Court has already concluded that she was untruthful about receiving such instructions from the Department substantially undermines her credibility with respect to her claim that she was estimating her gross earnings at all.  Moreover, on its face, the Debtor's testimony is contradictory in light of her insistence that she was estimating "consistently," apparently meaning that she was mostly reporting gross earnings ranging between $130.00 to $150.00, with the expectation that it would "all balance out."  Ultimately, the Debtor knew or should have known that, on an ongoing basis, her actual earnings were not the same as her reported gross earnings, and her testimony does not suggest any plan to reconcile the disparity.

---

[21] Though perhaps inconvenient for the claimant, this delay is no more than a biweekly employee would be forced to endure in any event.

[22] On her weekly claim certification dated January 30, 2010, the Debtor falsely stated that she had not worked that week, when in fact she had.  As a result of that false statement, she was not required to enter her gross earnings for that week.  Had the Debtor answered question 5 accurately but left her earnings blank in response to question 5(b), there would be no misrepresentation because her gross earnings could have been reported at a later date.  Given that she answered question 5 falsely, however, the Debtor avoided ever reporting her gross earnings for that week, rendering her non-response to question 5(b) a false representation as well.

The import of this problem is striking when the magnitude of the imbalance is considered at various points in time.  Prior to the Debtor's undisclosed period of not working that began after her weekly claim certification dated May 22, 2010, she had already underreported her gross earnings by $1,254.17.[23]  After reporting gross earnings for nine weeks during which she apparently earned none, the Debtor's actual gross earnings were still underreported by $144.17.[24]  Then, over the final ten weeks, the total amount of gross earnings underreported once again grew to $1,617.44.[25]  Thus, the reality of the Debtor's underreporting belies any contention that she believed her estimates would balance out over time.[26]

As previously stated, scienter can be established by showing that a debtor knows the facts are not as represented or otherwise knows that she lacks a factual basis for the representation.  See Palmacci, 121 F.3d at 788.  Here, the Court has found that the Debtor repeatedly represented facts to the Department that were contrary to what she must have known at the time she made those representations.  For example, the Debtor offered no explanation as to why she failed to report her hours or gross earnings from Winco Identification in 2004.  Indeed, even with respect to her gross earnings in 2010, the Court finds that the Debtor's insistence that she was estimating "consistently"—that is, without regard to the fact that her actual gross earnings were consistently higher than the amount reported—evidences that she knew that she lacked a factual basis for the

---

[23] See Ex. 8 at 4-20 (January 30, 2010 to May 22, 2010).

[24] See Id. at 4-28 (January 30, 2010 to July 17, 2010).

[25] See Id. at 4-39 (January 30, 2010 to October 2, 2010).

[26] As a brief aside, the Court does not find the Debtor's answers to question 6 on her weekly claim certifications, if false, were either knowingly or recklessly so.  As previously stated, question 6 asks, "[d]uring the week claimed, did you receive any monies not previously reported to this department, other than wages for hours actually worked?"  The Department argues that had the Debtor honestly estimated her gross earnings one week, she would be required to report any underreported gross earnings in response to question 6 the following week.  The Court is unconvinced that is true because the question on its face excludes "wages for hours actually worked."  Additionally, to the extent that the Department does not endorse the estimation of gross earnings in practice, it is doubtful there would be a procedure to address it.  In any event, the Court cannot find that the Debtor's answers were clearly false in light of these ambiguities, and therefore, they could not have been knowingly or recklessly false.

amounts being reported.  Notably, her post-trial contention that the prospective denial of her claim, based on insufficient information, provided an incentive to "estimate" her earnings is also telling. Moreover, the Debtor's assertion of simple carelessness in completing her weekly claim certifications is negated by the sheer volume of misrepresentations and her own admission that she never read questions 3, 6, or the certification.  In stark contrast, she would nonetheless have the Court believe that she was in regular contact with the Department to ensure her weekly claim certifications were completed accurately while steadily underreporting her gross earnings. Therefore, under the totality of the circumstances, the Court concludes that the Debtor made these false statements with the intent to defraud the Department.

In sum, the Court finds that the Debtor made a series of knowingly false statements on each of her weekly claim certifications that would have disqualified her from receiving any unemployment benefits.  See N.H. R.S.A. §§ 282-A:32(I)(a); 164.  Because the Debtor would have been disqualified from receiving any payments, the Department suffered an injury in the amount of unemployment benefits paid to her in both 2004 and 2010.  As such, the Court finds the entire debt owed to the Department is nondischargeable pursuant to 11 U.S.C. § 523(a)(2)(A).

## VI. CONCLUSION

For the reasons articulated above, the Court will enter judgment in favor of the Department with respect to Count I of the complaint.  This opinion constitutes the Court's findings of fact and conclusions of law in accordance with Fed. R. Bankr. P. 7052.  The Court will issue a separate judgment consistent with this opinion.

ENTERED at Concord, New Hampshire.


Dated: December 20, 2017                    /s/ Bruce A. Harwood
                                            Bruce A. Harwood
                                            Chief Bankruptcy Judge